FILED

2015 Jun-08  AM 11:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **EDNA GERALDINE FREEMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:13-cv-816-AKK** |
| **THE BOARD OF TRUSTEES OF** | ) | |
| **THE UNIVERSITY OF ALABAMA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff Edna Geraldine Freeman, a 59-year old[1] African-American with an arthritic condition, alleges that her former supervisors at the University of Alabama Birmingham's Center for Psychiatric Medicine ("CPM") discharged her unlawfully because of her race, age, and alleged disability. Doc. 7 at 4-7. Accordingly, Freeman brings claims against the Board of Trustees for the University of Alabama for race discrimination under Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981 (brought by and through 42 U.S.C. § 1983), age discrimination under Alabama law, and disability discrimination under Alabama law and the Americans with Disabilities Act Amendments Act ("ADAAA"). *Id.*

---

[1] This is Freeman's age as of the date of her charge with the Equal Employment Opportunity Commission. Doc. 7-1 at 2.

Before the court is the Board's motion for summary judgment. Doc. 48. For the reasons below, except for the race discrimination claims, the motion for summary judgment is due to be granted.[2]

## I. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at

---

[2] Also before the court are the Board's motions to strike certain evidence on which Freeman relies in response to the summary judgment motion. Docs. 60, 61. The motions are **DENIED** because—with one exception— the evidence at issue has no bearing on the court's ruling. As to the evidence that is relevant to the court's ruling, the motion is **DENIED** for the reasons in footnote twelve of this opinion. *See infra* pp. 14 n. 12. Plaintiff's motion to compel, doc. 36, which the court addressed during the February 13, 2015 discovery hearing, *see* doc. 37, is **MOOT**.

324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## FACTUAL BACKGROUND

As of February 2012, Freeman held a Psychiatric Assistant ("PA") position in the geriatric unit of CPM.[3] *See* doc. 50-1 at 22-24. However, Freeman occasionally volunteered to work overtime shifts in other units. *Id*. at 25. One such

---

[3] Freeman began working with CPM in 2006 as a Unit Support Specialist and earned a promotion to Unit Secretary in 2012. Doc. 50-1 at 11. Shortly after her promotion, CPM transferred Freeman to the PA position after eliminating the Unit Secretary position for budgeting purposes. Doc. 50-18 at 5.

overtime assignment led to Freeman's discharge. Specifically, on June 10, 2012, Freeman volunteered for an overtime shift from 6:30 a.m. until 2 p.m. at the adolescent unit. *Id.* at 29. During that shift, Freeman worked as a "sitter" for adolescent patient A.S.[4] *Id.* According to Jeana Fox, the Nurse Manager of the adolescent unit, Freeman's obligation as a "sitter" was to ensure that A.S. did not harm herself or others. Doc. 50-10 at 10.[5] Apparently, the "sitter" position requires constant attention because, as Director of CPM Steve Nasiatka explains, a patient can injure herself or others within seconds. *See* doc. 50-8 at 22. While Freeman believes that she properly executed her duties as a "sitter" that day, her supervisors disagreed after observing a surveillance video of purported inappropriate conduct between A.S. and the other patients. Fox initially retrieved the surveillance video to investigate an allegation from A.S. that another patient, J.M.C., "forced her to kiss him" in front of Freeman. Doc. 50-10 at 6, 7. When Fox asked Freeman if she saw the kiss, Freeman said no, and explained that she saw another patient, J.C., "pull J.M.C.'s pants down." *Id.* at 6; doc. 50-1 at 36. After viewing the video, Fox concluded that J.M.C and A.S. "appeared to kiss," and that the video revealed other inappropriate conduct between A.S. and other adolescent patients, including the incident where J.C. pulled down J.M.C's shorts. *Id.* at 11, 24. Based on Fox's

---

[4] The parties and the court refer to the adolescent patients by their initials to protect the patients' privacy.

[5] While none of Freeman's supervisors confirmed this, nurse Joe Tucker, charge nurse Elaine Spaulding, and two other employees in the adolescent unit explain that Freeman was required to be "in arms reach and eyesight" from A.S. at all times. Docs. 50-16 at 7; 50-17 at 6; 50-19 at 4; 50-20 at 4.

recommendation, Nasiatka and Freeman's direct supervisor in the geriatric unit (Kimberly Ayers) discharged Freeman on June 25, 2012 for "provid[ing] a false statement" about the alleged kissing incident and for failing to "maintain [a] safe and secure environment" for the patients. Docs. 50-10 at 17; 50-9 at 27.

According to the surveillance video before court, the conduct at issue occurred over the course of approximately five minutes from 1:04 p.m. until 1:09 p.m.[6] and primarily involved three patients: A.S., J.M.C, and J.C. *See* Surveillance Video from June 10, 2012 *SEALED*. Throughout the video, which has no audio, A.S., J.M.C., and J.C. congregate in the hallway of the unit, next to the nurse's station (which has windows spanning the length of the entire station). *Id.* *SEALED*. As far as the court can discern from the video, the three patients appear to be smiling, laughing, skipping, and teasing each other. *Id.* *SEALED*. Meanwhile, the footage shows Freeman sitting in a chair in the hallway in the center of the area where the patients are congregated. *Id.* *SEALED*.

### A. Alleged kiss between J.M.C. and A.S.

At the start of the video, J.M.C., who is standing facing A.S. within arm's length of A.S.'s body, reaches out and rests his palms on A.S.'s shoulders for less than one second, and then walks away. *Id.* *SEALED* at 13:04:03-05. A few seconds later, with his back to the camera, J.M.C. approaches A.S. again, grabs her

---

[6] Freeman disagrees with the time stamp on the video and maintains that the events occurred at a different time because at 1 p.m., she was "aiding [Elaine] Spaulding[, the charge nurse,] with an incident with" another patient. Doc. 58-11 at 13.

by the shirt near her neck, and brings his face very close to hers for less than one second.[7] *Id.* *SEALED* at 13:04:10-12. At that moment, nurse Joe Tucker appears in the video through the window of the nurse's station next to J.M.C. and A.S. *Id.* *SEALED* at 13:04:12. A.S. turns to look at Tucker through the window of the nurse's station, and almost simultaneously J.M.C. and A.S. quickly separate. *Id.* *SEALED*. Tucker, like Freeman, maintains that he never witnessed any kiss between J.M.C and A.S. Docs. 50-13 at 92; 50-17 at 5. As for Freeman, the surveillance video is inconclusive as to whether she was looking in J.M.C. and A.S.'s direction during the purported kiss. *Id.* *SEALED* at 13:04:10-15.[8]

## B. Other inappropriate conduct

Aside from the alleged kiss, the other alleged inappropriate conduct primarily centers around A.S. and J.C.'s attempts to pull down J.M.C.'s shorts. Less than a minute after the alleged kiss, the video shows A.S. touching and attempting to raise J.M.C.'s shorts, which are seemingly baggy. Surveillance Video *SEALED* at 13:04:54-56. In reaction, J.M.C. reaches out and, while facing A.S., holds her by her forearms and guides her backwards several feet into a corner against the window of the nurse's station. *Id.* *SEALED* at 13:04:58-13:05:00. J.M.C. and A.S. are not visible to the camera for a few seconds, but Freeman

---

[7] This is the purported kiss that Fox and Nasiatka observed when they reviewed the surveillance video.

[8] The video is inconclusive because—with respect to the footage from the camera facing Freeman during the incident—the few seconds of footage of this interaction are completely missing. *See* Surveillance Video *SEALED* at 12:04:10-15.

appears to be watching them during this time. *Id.* *SEALED*. As J.M.C. and A.S. walk out of the corner, A.S. approaches J.M.C. from behind and tugs downwards on his shorts. *Id.* *SEALED* at 13:05:11-12. J.M.C.'s shorts do not come off, and A.S., J.C., and Freeman appear to be laughing. *Id.* *SEALED* at 13:05:13-15.

For the next several seconds, the video shows A.S., J.M.C., and J.C. skipping and walking around Freeman in the hallway. *Id.* *SEALED* at 13:05:15-38. The three patients walk to the back of the hallway a few feet behind Freeman, who has her head turned halfway toward them. *Id.* *SEALED* at 13:05:35-40. The video next shows J.C. appearing to rub her buttocks against the front of J.M.C's body for approximately one second, and the patients appear to be laughing. *Id.* *SEALED* at 13:05:38-43. Presumably after hearing the laughter, Freeman turns her head fully around, and at that moment, A.S. hits J.M.C. on his buttocks and walks a short distance away laughing. *Id.* *SEALED* at 13:05:43-48. Still behind Freeman, J.C. briefly attempts to pull down J.M.C.'s shorts. *Id.* *SEALED* at 13:05:50. It is not clear from the video whether J.C. succeeded, and the three patients quickly separate and all appear to be laughing. *Id.* *SEALED*. Freeman appears to be speaking to the patients, perhaps telling them to stop,[9] *id.* *SEALED* at 13:05:58, and A.S and J.C. give each other "high fives," *id.* *SEALED* at 13:06:04.

---

[9] As far as the court can discern from attempting to read her lips, Freeman appears to say, "Y'all need to stop." Surveillance Video *SEALED* at 13:05:58.

Less than one minute later, A.S. and J.C. execute their third attempt to pull down J.M.C.'s shorts. This time, A.S. initially reaches out to pull the shorts, but J.M.C. dodges her attempt. *Id.* *SEALED* at 13:06:36-37. Then, J.C. succeeds in pulling J.M.C.'s shorts down after an interaction that lasts approximately ten seconds, with J.M.C. falling to the floor while resisting and trying to pull his shorts back up. *Id.* *SEALED* at 13:06:38-49. After the incident, J.C. and A.S. walk away and "high five" each other. *Id.* *SEALED* at 13:06:50-53. Throughout this incident, Freeman is sitting near the patients. *Id.* *SEALED* at 13:06:38-49. For the first five seconds of the ten-second episode during which J.M.C. attempted to resist J.C., Freeman remains seated and appears unaffected. *See id.* *SEALED* at 13:06:39-45. Toward the end of these five seconds, J.M.C. is on the floor resisting J.C., and J.C. had basically succeeded in pulling down J.M.C's shorts. *Id.* *SEALED*. At this point, the footage from the camera facing Freeman skips over the next nine seconds. *See id.* *SEALED* at 13:06:45, 13:06:54.[10] When the footage resumes, Freeman is still seated, and J.C. has walked away from J.M.C. and is sitting in a chair in the hallway in front of Freeman. *Id.* *SEALED* at 13:06:54-13:07:00. J.M.C. leaves the hallway briefly and is outside of the camera's view for approximately the next fifteen seconds. *Id.* *SEALED* at 13:07:00-15. J.M.C. then returns to the hallway and approaches J.C., who is still seated in the

---

[10] Perhaps because the video skips on two occasions, Freeman "recalls [the] incidents in the video . . . [but disputes] that they were sequential in nature." Doc. 58-11 at 8.

chair in front of Freeman, and J.C. reaches forward and again attempts to pull down J.M.C.'s shorts. *Id.* *SEALED* at 13:07:15. For the next several seconds, Freeman is looking toward J.C. and appears to speak to her. *Id.* *SEALED* at 13:07:18-31. J.C. at one point seems to acknowledge Freeman by turning her head and looking toward Freeman. *Id.* *SEALED* at 13:07:24. For the remainder of the video, neither A.S. nor J.C. attempt to pull down J.M.C.'s shorts. *See id.* *SEALED* at 13:07:24-13:08:50.

The last incident of inappropriate conduct occurred about one minute after J.C. pulled down J.M.C's shorts. While J.C. is sitting in the chair in front of Freeman, J.M.C. approaches and sits on the arm of the chair, and then leans onto J.C. and makes pelvic thrusting motions onto her body for approximately three seconds. *Id.* *SEALED* at 13:08:22-27. As J.M.C. is doing this, Tucker appears from the window of the nurse's station, and J.M.C. quickly stands up from the chair. *Id.* *SEALED* at 13:08:27-34. Tucker appears to gesture toward J.M.C. as J.M.C. looks toward Tucker through the window. *Id.* *SEALED* at 13:08:30-32. During this incident, Freeman is seated close by and, even though it appears that she sees J.M.C's behavior, does not appear to react in any way. *Id.* *SEALED* at 13:08:27-34. A few seconds later, J.M.C. approaches J.C. again, stands facing J.C. while J.C. is seated, and places his palms on top of her shoulders. *Id.* *SEALED* at 13:08:37. When J.C. tries to push him away, J.M.C. leans forward and places the

weight of his entire body on J.C. for approximately four seconds. *Id*. *SEALED*
at 13:08:38-44. During this interaction, Freeman is gesturing in J.M.C's direction
and looks like she is speaking. *Id*. *SEALED*. While J.M.C. is laying on top of
J.C., Elaine Spaulding (the charge nurse on duty that day) appears in the window
of the nurse's station and appears to witness J.M.C.'s behavior. *Id*. *SEALED* at
13:08:41-44. Presumably, Spaulding either spoke to J.M.C.[11] or knocked on the
window because J.M.C. suddenly stood up, walked over to Spaulding, and
appeared to communicate with Spaulding with hand gestures. *Id*. *SEALED* at
13:08:45-50.

## C. Freeman's termination and alleged discriminatory animus

According to Nasiatka, who ultimately made the decision to discharge
Freeman, Freeman had a duty "at a minimum, [to remove] A.S. from the situation
where the three [patients] . . . were making contact with one another, and [seek]
help . . . from the nursing staff." Doc. 50-8 at 21. Nasiatka explains that although
the patients in the adolescent unit are prohibited from touching each other, the
patients nonetheless touch each other "quite frequently," and the staff is trained to
first verbally tell them to stop. *Id*. Then, if the touching "doesn't happen again . . .
the verbal redirection has worked. However, if it doesn't stop then it is a
continuation, which would require some additional . . . intervention." *Id*. From

---

[11] According to Freeman, the nurse's station was not enclosed on the top to allow the nurses to hear and
communicate with persons in the hallway. Doc. 58-11 at 2.

Nasiatka's perspective, the conduct in the video "was all a continuation of an issue that should have been resolved in a more meaningful way." *Id*. Specifically, Nasiatka explains that Freeman should have [gotten] up and physically separated" the patients to put an end to the touching. *Id*. at 29.

Freeman counters that each time she observed touching, she verbally redirected the patients to stop, and the patients complied. Doc. 58-11 at 11. She also explains that her supervisors "never offered [her] the opportunity to view the video . . . to explain [her] actions or to provide context or to explain that there were nurses directly witnessing the behavior, which [she] could see from [her] vantage point." *Id*. at 8. Moreover, while Nasiatka believed Freeman gave a false report by saying that she did not witness the alleged kiss between A.S. and J.M.C., doc. 50-8 at 26, Freeman maintains that she in fact did not see the alleged kiss, doc. 58-11 at 8. In light of this, Freeman filed this lawsuit alleging that her supervisors discharged her based on race, age, and disability animus.

## VI. ANALYSIS

The Board contends that it is entitled to sovereign immunity as to the Alabama age and disability discrimination claims, and summary judgment as to all remaining claims. With respect to the issue of immunity, the Board is correct that, under Article I, Section 14 of the Alabama Constitution, "[t]he State of Alabama shall never be made a defendant in any court of law or equity." This provision "has

been described as a 'nearly impregnable' and 'almost invincible' 'wall' that

provides the State an unwaivable, absolute immunity from suit in any court." *Ex*

*parte Town of Lowndesboro,* 950 So. 2d 1203, 1206 (Ala. 2006). Significantly, this

court has previously held that the "Board of Trustees [of the University of

Alabama] . . . is a state agency entitled to governmental immunity under the

Alabama Constitution." *Harris v. Bd. of Trustees Univ. of Alabama*, 846 F. Supp.

2d 1223, 1235 (N.D. Ala. 2012); *see also Hutchinson v. Bd. of Trustees of Univ. of*

*Alabama*, 256 So. 2d 281, 283 (Ala. 1971) (Alabama Constitution prohibits the

Board "from being made a party defendant in any suit at law or in equity"). In light

of this legal authority, the court agrees that the Board is immune from Freeman's

age and disability discrimination claims that are premised on Alabama law.

Accordingly, the court will dismiss these claims.

### A. Federal race and disability discrimination claims

As to the remaining race and disability discrimination claims, the Board

contends that Freeman cannot establish a *prima facie* case, or alternatively, that she

cannot rebut the reason for her termination. Doc. 49 at 25-30. The court will first

address Freeman's race discrimination claims under Title VII and Section 1983,

and then turn to her disability discrimination claim under the ADAAA.

#### 1. Race discrimination

To establish a *prima facie* case of race discrimination under Title VII or

Section 1983, Freeman must show that (1) she belongs to a protected class; (2) she was subjected to an adverse job action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973)). At issue here is the third element—i.e., whether Freeman has identified a similarly situated employee that was "involved in or accused of the same or similar conduct" but that her supervisors "disciplined in different ways." *See id*. For this inquiry, the burden is on Freeman "to show a similarity between [her] conduct and that of white employees who were treated differently and not on [the Board] to disprove their similarity." *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (citation, alteration, and internal quotation marks omitted). In assessing similarity between Freeman's conduct and that of her comparators, "'[t]he most important variables in the disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses committed and the nature of the punishments imposed.'" *Id*. at 1540 (citation omitted). In this regard, the Eleventh Circuit requires "that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

Here, Freeman maintains that Spaulding and Tucker, who are both Caucasian, committed "nearly identical" misconduct because they "witnessed much of the allegedly sexual horseplay that is charged against [Freeman]" and did "nothing more, and perhaps even less" to address the situation. Doc. 57 at 29. Spaulding and Tucker indeed appear in the video during three of the critical instances of inappropriate touching and, like Freeman, do not appear to make any physical attempt to separate the patients. Surveillance Video *SEALED* 13:04:12, 13:08:27-34, 13:08:41-44. Furthermore, although the video does not show the entire nurse's station, Freeman maintains that from her vantage point, she saw the nurses "directly witnessing the behavior." Doc. 58-11 at 8.[12] In light of this evidence and the limited vantage point of the video, the court concludes that a jury should decide whether Spaulding and Tucker also observed the same behavior that

---

[12] The Board moved to strike this evidence from paragraph 33 of Freeman's April 27, 2015 declaration, contending that Freeman's declaration is (1) a sham declaration that contradicts her deposition testimony, and (2) based on speculation "to the extent she relies on the [surveillance] video to support these allegations." Doc. 60 at 3-4, 10. The court rejects both of these arguments because, first, it finds no inconsistency between Freeman's deposition and her declaration on this issue. The Board cites to Freeman's responses to broad deposition questions such as, "Can you tell me everything that you know that supports your claim of discrimination?" and, "Have you told me all the facts and evidence that you have?" Doc. 50-1 at 54, 57, 59, 61. However, absent a specific deposition question asking whether Freeman could see the nurses in the nurse's station from her vantage point during the relevant time period, the court is not prepared to strike the evidence. *See Van T.Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) (requiring "clear answers to unambiguous [deposition] questions which negate the existence of any genuine issue of material fact" and disregarding portions of the plaintiff's affidavit as a sham where he "made crystal clear in three places in the deposition" that his contract with the defendant did not contain a condition but later stated plainly in his affidavit that it did). Finally, as to the Board's second contention, the court finds no evidence that Freeman is relying on the surveillance video to formulate her contentions. Rather, Freeman is apparently relying on her recollection in stating, "There were nurses directly witnessing the behavior, which I could see from my vantage point." Doc. 58-11 at 8.

Freeman witnessed, failed to act, and yet faced no discipline.[13]

Ultimately, even if Spaulding and Tucker are not similarly situated comparators, this "does not necessarily doom [Freeman's] case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, "where the plaintiff presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent—the essential element of a claim for discrimination—the plaintiff will always survive summary judgment." *Jones v. Water Works Bd. of the City of Birmingham*, No. 2:10-CV-1323-AKK, 2012 WL 2856651, at *10 (N.D. Ala. July 5, 2012) (citing *Lockheed-Martin*, 644 F.3d at 1328) (internal quotation marks omitted). And indeed, "a triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Silverman v. Bd. of Educ.,* 637 F.3d 729, 733 (7th Cir.2011)). While anti-discrimination laws do not prevent an employer from "interpret[ing] its rules as it chooses . . . and . . . mak[ing] determinations as it sees fit,"[14] *Maniccia*, 171 F.3d at 1369, nonetheless,

---

[13] The court finds no support for the Board's contention that a "sitter" is not similarly situated to the nurses. In fact, there is no evidence establishing that only Freeman had an obligation to address the patients' behavior. To the contrary, at least some responsibility seemingly rests with the nurses since Nasiatka's claim is that Freeman should have "sought help . . . from the nursing staff." Doc. 50-8 at 21.

[14] In this regard, the Board relies on Nasiatka's belief that Freeman's position as a "sitter" for A.S. required her to remove A.S. from the situation with J.C. and J.M.C. Doc. 50-8 at 21. However, there is an issue of fact on this point in light of Fox's testimony that A.S. was not constantly "on one-to-one" with Freeman during the shift because CPM was "trying to kind of taper [A.S.] off of one-to-one [with a sitter]" at the time. Doc. 50-10 at 23-24. Because of this, throughout a given day, A.S. is sometimes "on one-to-one" but at other times is "off of one-to-one." *Id*. And,

the court cannot allow an employer to gloss over an incomplete record, especially where, as here, it pertains to a critical disputed fact. Specifically, the surveillance video before the court skips over key portions of the footage from the camera facing Freeman—particularly the portion where J.M.C. and A.S. allegedly kissed and when J.M.C. was on the ground fighting off J.C.'s attempt to pull down his shorts. *See* Surveillance Video *SEALED* at 13:04:10-15; 13:06:45; 13:06:54. Moreover, the court notes that Tucker told his supervisors that he did not witness a kiss between J.M.C. and A.S., doc. 50-17 at 4,  and—although he appears in the surveillance video standing in the nurse's station near J.M.C and A.S. during the alleged kissing incident, *see* Surveillance Video *SEALED* 13:04:12—seemingly faced no accusation of lying like Freeman. In light of this evidence, the court finds "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the record that create a "genuine issue of material fact as to the truth or falsity" of the reason for Freeman's termination. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1267 (11th Cir. 2010) ("weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reason establishes pretext); *Evans v. McClain of Ga., Inc.,* 131 F.3d 957, 963 (11th Cir.1997) ("[A] plaintiff can survive a motion for summary judgment . . . simply by presenting evidence sufficient to demonstrate a genuine issue of material fact as

---

Fox admits that she is "not sure what A.S.'s pattern" was for that particular day or whether she was on one-to-one during the relevant window of time. *Id*. According to Freeman, "A.S. was not on one-on-one anymore at one o'clock." Doc. 50-1 at 34.

to the truth or falsity of the employer's legitimate, nondiscriminatory reasons."). For these reasons, the court will deny summary judgment as to the race discrimination claims.

### 2. *Disability discrimination*

To establish her *prima facie* case of discriminatory discharge under the ADAAA, Freeman must show that she (1) had a disability, (2) was otherwise qualified to perform the job, and (3) was discriminated against based on her disability. *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1149 (11th Cir. 2005). At issue here is whether Freeman meets the first element, which requires a showing that (a) she suffers from a physical or mental impairment that substantially limits one or more of the major life activities, (b) there is a record of such impairment, or (c) her employer regarded her as having such an impairment. 42 U.S.C. § 12102(2). The court concludes that Freeman has not met this burden and will address each element in turn.

#### a. There is no evidence that Freeman's impairment substantially limits her major life activities

Freeman maintains that her arthritis substantially limits her major life activities because she suffers from "abnormal movement of her knees" which often makes walking and sitting painful. Docs. 57 at 37-38; 58-13 *SEALED* at 40. Unfortunately, pain alone is insufficient to establish a claim; rather Freeman must

show that her arthritis "substantially limits" her ability walk or sit—i.e., that her walking or sitting is "significantly restricted as to the condition, manner or duration under which the average person in the general population can perform the same major life activity [of walking and sitting]." *See Rossbach v. City of Miami*, 371 F.3d 1354, 1357, 1359 (11th Cir. 2004). Freeman failed to present any such evidence, and, accordingly, her claim fails. *See id.* (testimony that plaintiff "cannot sleep normally" did not establish substantial limitation because it "was couched in vague terms and unaccompanied by any evidence that the described afflictions were any worse than is suffered by many adults").

b. There is no record of Freeman's alleged disability

Similarly, while Freeman maintains that she discussed her arthritic condition with Ayers and Erwin in February or March of 2012,[15] doc. 57 at 38, there is no evidence of the necessary record of "a history of . . . a mental or physical

---

[15]Freeman maintains that when she joined the geriatric unit in February 2012, she informed Ayers of her "diagnosis of arthritis that adversely affected [Freeman's] knees and . . . [her] ability to take stairs." *Id.* Ayers allegedly told Freeman to take the elevator, and that "other nurses complained about [Freeman] being 'slow walking.'" *Id.* Also, "Ayers required [Freeman] to sign a form that was specifically tailored to [her] . . . that emphasized the walking required and the requirement to walk quickly from time to time . . . as a condition to . . . being transferred to the PA position." *Id.*

Freeman also describes that Greg Erwin in human resources—who sat in on Freeman's termination—was aware of Freeman's "situation with [her] knees and her arthritic condition" because they had discussions about it. *Id.* While Erwin claims he did not know of any disability, doc. 50-12 at 31, the record includes an email thread between Nasiatka and the Director of Employee Relations Anita Bonasera where Nasiatka explains that Erwin had been privy to the fact that "Ayers . . . began to notice issues with Ms. Freeman's mobility and capabilities to perform her role" in the geriatric unit, doc. 58-9. Once Ayers noticed these issues, Erwin gathered "fitness for duty" documentation, and Erwin had the results of that process as of July 5, 2012. *Id.* Finally, during the termination meeting, Freeman claims that Nasiatka made a comment about the amount of time it took Freeman to get out of her chair during the June 10, 2012 shift. Doc. 50-26 at 5.

impairment that substantially limits one or more major life activities." 45 C.F.R. §

84.3(j)(2)(ii). As such, her claim also fails for this reason.

  c.  There is no evidence that Freeman's supervisors regarded her as disabled

Finally, the evidence is insufficient to establish that Freeman's supervisors

regarded her as disabled. To meet this element, Freeman must show that she "(1)

has an impairment that does not substantially limit a major life activity, but is

treated by an employer as though it does; (2) has an impairment that limits a major

life activity only because of others' attitudes towards the impairment; or (3) has no

impairment whatsoever, but is treated by an employer as having a disability as

recognized by the [Americans with Disabilities Act]." *Standard v. A.B.E.L. Servs.,*

*Inc.*, 161 F.3d 1318, 1327 n. 2 (11th Cir. 1998) (citing 29 C.F.R. § 1630.2(l)).

Under each of these elements, "[a]s with actual disabilities, a perceived impairment

must be believed to substantially limit a major life activity of the individual." *Id*. at

1327. In attempting to meet this standard, Freeman points to two facts: Ayers'

statement that other employees complained of Freeman being "slow walking," and

the e-mail Nasiatka sent to Bonasera where he noted that Ayers "began to notice

issues with Ms. Freeman's mobility and capabilities to perform her role." Docs.

58-9; 58-11 at 7. However, this evidence alone does not show that Ayers or

Nasiatka "considered [Freeman] as significantly restricted in the ability to perform

either a class of jobs or a broad range of jobs in various classes as compared to the

average person having comparable training, skills, and abilities." *See Morales v.*

*Georgia Dep't of Human Res., Dep't of Human Res., Div. of Family & Children*

*Servs.*, 446 F. App'x 179, 182-83 (11th Cir. 2011); *Standard*, 161 F.3d at 1328.

Therefore, because the court finds no evidence that Freeman's supervisors treated

her as if she suffers from a substantially limiting impairment, the court rejects

Freeman's argument on this issue. For these reasons, in light of the lack of

evidence establishing Freeman's disability, the court concludes that Freeman's

disability discrimination claim fails at the *prima facie* level.

### IV. CONCLUSION

For the reasons stated above, the Board's motion for summary judgment is

due to be granted with respect to the age and disability discrimination claims and

denied with respect to the race discrimination claims. The court will enter a

separate order consistent with this opinion.

**DONE** the 8th day of June, 2015.

_____

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE
